The OVID BELL PRESS,
INC., Appellant,

v.

DIRECTOR OF REVENUE,
Respondent.

Walsworth Publishing Company,
Inc., Appellant,

v.

Director of Revenue, Respondent.

Nos. SC 82972, SC 82977.

Supreme Court of Missouri,
En Banc.

April 24, 2001.

Edward F. Downey, Jefferson City, John P. Barrie, B. Derek Rose, St. Louis, for Appellant in No. SC82972.

Jeremiah W. (Jay) Nixon, Atty. Gen., Alana M. Barragan-Scott, Deputy State Solicitor, Jefferson City, for Respondent in Nos. SC82972 & SC82977.

Lawrence P. Katzenstein, Thompson Coburn, St. Louis, for Amicus Curiae in No. SC82972.

Matthew J. Verschelden, Elizabeth K. Hudak, Kansas City, for Appellant in No. SC82977.

Juan D. Keller, B. Derek Rose, St. Louis, Edward F. Downey, Jefferson City, for Amicus Curiae in No. SC82977.

BENTON, Judge.

The Director of Revenue audited Walsworth Publishing Company, Inc ., for sales and use tax on its purchases of materials between 1994 and 1997. Ovid Bell Press, Inc., paid use tax under protest on an out-of-state purchase of film in February 1999. The Director and the Administrative Hearing Commission ruled against both taxpayers. Walsworth and Bell appeal, and the cases are consolidated for opinion. *Mo. Const. Art. V, sec. 3.* Reversed and remanded.

## I.

Ovid Bell Press, Inc., prints magazines and other publications. Bell collects tax on the retail sale of printed materials, unless exempt from sales tax.

Bell buys film out-of-state. Exposing the film, Bell photographs camera-ready paper or electronic files supplied by the customer. These negatives Bell makes for all customers except those providing usable negatives.

Numerous customers request that all negatives be returned to them or sent to other entities, such as other printers. In the absence of a request, Bell stores negatives in its film library at no charge. However, Bell charges a $3.90 "film pick-up fee" to reuse negatives from a previous job. After reuse, negatives are re-filed in the library.

For printing jobs, Bell uses a standard proposal letter, which states:

> MATERIAL STORAGE: negatives will be stored for fourteen (14) months after an issue's printing, at which time they will be destroyed unless we are otherwise instructed. Packing and shipping will be charged on the basis of actual cost.

Bell also gives customers a postcard listing the options for negatives, which include returning them to the customer, or forwarding them to another printer.

On invoices, Bell does not itemize the cost of the film it buys, or the sale of negatives to customers. Once the customer pays for a job, the negative is the customer's. Bell cannot use negatives without the customer's permission. The customer controls the ultimate disposition of negatives. After a 14–month period, unless the customer directs otherwise, Bell discards the negatives, by giving or selling them to recyclers.

## II.

While the Bell case concerns only film, Walsworth and the Director dispute the taxation of several materials, purchased both in-state and out-of-state. In this part II, the disputed materials are highlighted in italics. In the appendix to this opinion, dollar amounts are listed for each disputed material.

Walsworth produces and prints yearbooks for schools, as well as books and other publications for commercial customers. Walsworth photographs each page of camera-ready paper supplied by the customer. Once exposed, the *film* becomes a negative, which cannot be exposed for another image. Walsworth then applies a *film hardener* that physically adheres to the negative.

Negatives often have defects—small holes or unwanted specks—that Walsworth covers with ink from an *opaquing pen.* Walsworth places the negative for each page on a sheet of clear *acetate plas-*

*tic,* by using *red litho tape.* Atop the acetate plastic, Walsworth puts a sheet of *orange-vinyl/masking paper.* After printing is complete, negatives are placed in a *cardboard folder,* closed with *filament tape.*

The images on each negative transfer to a printing plate that imprints each page. Before 1996, Walsworth sprayed the printing plates with *developer,* which physically adhered to the plates in order to raise and enhance images. The plates were then scrubbed, rinsed, and given a gum-like *finisher,* which also physically adhered to the plates.

As for schools, the purchase agreement states:

> Film negatives and plates are the property of the customer and will be stored by Walsworth for a period of 30 days. Unless notified differently by the customer, all film negatives and plates will be destroyed after this 30 day period.

In fact, Walsworth stores yearbook negatives for three months—if not sooner delivered to the customer—rather than the 30 days stated in the agreement.

As for commercial customers, the purchase agreement states:

> Film negatives and plates are the property of the customer and will be stored by the printer for a period of one year. Unless notified differently by the customer, all film negatives and plates will be destroyed after this one year period.

Since January 1997, the agreement states that storage is for three years, which was, in fact, the practice before January 1997. After the three-year period, Walsworth contacts the customer regarding disposal of negatives. Walsworth's commercial purchase agreement further states:

### CUSTOMER'S PROPERTY

The printer will maintain fire, extended coverage, vandalism, malicious mischief, and sprinkler leakage insurance on all property belonging to the customer, while such property is in the printer's possession; printer's liability for such property shall not exceed the amount recoverable from such insurance. Customer's property of extraordinary value shall be insured through mutual insurance.

In sum, a school or commercial customer may instruct Walsworth to:

1) deliver the negatives to the customer—along with the attached acetate plastic, orange vinyl, and red litho tape, as well as cardboard folders and filament tape. The customer then may take negatives to another printer,

2) store the negatives longer than the normal storage time, or

3) destroy them immediately.

Most customers do not request the negatives. In fact, sixty percent are schools, who rarely request negatives (because yearbooks are not reprinted). Some commercial customers request the negatives. Almost one third of commercial customers order reprints. For reprints, Walsworth reuses the negatives without a new charge.

Walsworth separately itemizes the cost of negatives on its estimates for commercial jobs, and the standard price for yearbook sales. These estimates are neither disclosed to customers, nor separately stated on invoices to customers.

If a change by the customer requires additional film, plates or related items, Walsworth charges for such extra costs. Walsworth's computer printouts itemize the cost of negatives–which is not disclosed to customers.

If customers do not request negatives after the storage period, Walsworth sells them to a recycler. Walsworth signs a

pick-up receipt, stating that it holds true and lawful title to the materials and is authorized to release them. Over the three-year audit period, Walsworth received $187,000 from film recyclers.

In printing commercial and school orders, Walsworth incorporates photographs from the customer. Walsworth places an *adhesive label* on the back of each photograph to identify it. From the photograph, Walsworth often creates a color copy "spider print" on *color copy paper*, in reduced or enlarged form. Upon completing the job, Walsworth delivers all spider prints to the customer, along with the original photographs. Walsworth charges a set fee for each spider print, which is sometimes separately itemized on the invoice, but always included in the total job charge.

If a customer requests, Walsworth creates a four-color "match print" of a page of materials. A match print consists of *colored emulsion sheets* laminated to *match print base paper*. Walsworth sends the customer the match print for mark-up or approval. The customer returns the match prints to Walsworth, with changes indicated.

For yearbooks and certain commercial jobs, Walsworth inputs the text into a computer, then prints it on *proof correction paper*. This paper goes into a *proof folder* to protect it during shipment to and from the customer, who indicates changes on the proof corrections.

Walsworth keeps the match prints and proof correction papers/folders for about six months after printing, although the customer may request and keep them. Walsworth charges a set fee for each match print or proof correction paper, which is sometimes separately itemized on the invoice, but always included in the total job charge.

None of Walsworth's invoices, contracts, or agreements state that the acetate plastic, red litho tape, orange vinyl, cardboard folders, filament tape, color copy paper, match print base paper, colored emulsion paper, proof correction paper, and proof folders are the property of the customer or purchased by the customer.

Walsworth collects sales tax on the total invoice price on in-state sales to non-exempt customers. Walsworth collects applicable sales tax on the total invoice price on out-of-state sales to non-exempt customers.

### III.

Section 144.030.2(2) RSMo 1994[1] exempts from sales tax:

> Materials ... which when used in manufacturing ... become a component part or ingredient of the new personal property resulting from such manufacturing ... and which new personal property is intended to be sold ultimately for final use or consumption ...

Section 144.615(3) adopts this exemption for the use tax.

This Court reviews *de novo* the AHC's interpretation of this statutory exemption. *Zip Mail Services v. Director of Revenue*, 16 S.W.3d 588, 590 (Mo. banc 2000). As to the first element of the exception, manufacturing includes the process of printing. *Heidelberg Central, Inc. v. Director of Revenue*, 476 S.W.2d 502, 506 (Mo. 1972).

A material is a component part or ingredient if any part of it is intended to and does remain an essential or necessary element of new personal property. *Al–*

**1.** All statutory citations are to RSMo 1994, unless otherwise indicated.

*Tom Investment, Inc. v. Director of Revenue*, 774 S.W.2d 131, 134–35 (Mo. banc 1989); *Doe Run Resource Co. v. Director of Revenue*, 982 S.W.2d 269, 272 (Mo. banc 1998). Walsworth does not satisfy this requirement for the opaquing pens, as they do not become part of the new personal property. (No separate claim is made for the ink dispensed from the opaquing pens.) Likewise, the adhesive labels are placed not on new personal property, but on the customer's property. The adhesive labels are not component parts or ingredients.

Most materials at issue clearly satisfy this element. The film is a component part or ingredient of the negatives. The acetate plastic, red litho tape, orange vinyl, and film hardener physically attach to the negative, and thus are component parts or ingredients. Color copy paper is a component part or ingredient of the spider prints.

Match print base paper and colored emulsion sheets are component parts or ingredients of match prints. Similarly, the proof correction papers are component parts or ingredients of the proof corrections.

■■■ The main dispute is whether the negatives, spider prints, match prints, and proof corrections are "intended to be sold ultimately for final use or consumption." This element requires a "sale" of the new tangible personal property, within the meaning of the sales tax law. See *DST Systems v. Director of Revenue*, 43 S.W.3d 799, 803 (Mo. banc 2001); *International Business Machines Corp. v. Director or Revenue*, 958 S.W.2d 554, 557–58 (Mo. banc 1997); *Blevins Asphalt Constr. Co. v. Director of Revenue*, 938 S.W.2d 899, 901 (Mo. banc 1997). A sale is (1) a transfer of (2) the title or ownership of tangible personal property (3) for consideration (4) for the purchaser's use or consumption and

not for resale in any form. *Section 144.010.1(8); Dean Machinery Co. v. Director of Revenue*, 918 S.W.2d 244, 246 (Mo. banc 1996).

■■ In these cases, consideration clearly exists. Taxpayers need not show an "extra or explicitly stated charge" for materials. *Sipco, Inc. v. Director of Revenue*, 875 S.W.2d 539, 542 (Mo. banc 1994). Here, the cost of negatives, spider prints, match prints, and proof corrections are included into the total consideration that customers paid.

■■ The Director argues that title or ownership of the new personal property does not transfer to customers. Passage of title or ownership ordinarily occurs upon delivery, unless otherwise agreed by the parties. *Kurtz Concrete, Inc. v. Spradling*, 560 S.W.2d 858, 861–62 (Mo. banc 1978). The key is the intent of the parties, as evidenced by all relevant facts, including custom or usage of trade. *Blevins*, 938 S.W.2d at 901; *House of Lloyd, Inc. v. Director of Revenue*, 824 S.W.2d 914, 923 (Mo. banc 1992).

The taxpayer-printers transfer title or ownership of negatives to their customers, by the express terms of the agreement with customers. Walsworth's contract flatly says: "Film negatives . . . are the property of the customer." As for Bell, the AHC found that the negatives Bell makes are "the customer's."

The Director stresses that customers frequently do not request possession of the negatives. However, possession is not conclusive of title or ownership. According to *Kurtz Concrete*, the key is "the intent of the parties as to when title passes." *Kurtz*, 560 S.W.2d at 861.

The Director argues that the taxpayer-printers do not satisfy the fourth prong of a "sale" because they, not their customers,

are the ultimate users and consumers of the negatives during the printing process. "Use or consumption" in the definition of "sale at retail" refers to the ultimate user or consumer, who controls the item during its useful life. *144.010.1(8); Berry–Kofron Dental Lab. Co. v. Smith,* 345 Mo. 922, 137 S.W.2d 452, 454–55 (1940). On the record here, the customers control the negatives during their useful life.

Likewise, that the taxpayer-printers sell (or give) negatives to a recycler does not change the result because the customer owns and controls the negatives at all times, even authorizing their disposal. A "sale" expressly includes such "conditional" sales. *Section 144.010.1(7); House of Lloyd, Inc. v. Director of Revenue,* 884 S.W.2d 271, 275–76 (Mo. banc 1994).

■ The AHC ruled for the Director, relying on its cases holding that the cost of the film or negatives must be itemized on invoices to customers. AHC cases are not precedent for this Court. *Central Hardware Co. v. Director of Revenue,* 887 S.W.2d 593, 596 (Mo. banc 1994); *Southern Red–E–Mix v. Director of Revenue,* 894 S.W.2d 164, 166 (Mo. banc 1996). More importantly, itemization on invoices is only one way that parties express their intent to transfer title or ownership to the ultimate user. Based on all the facts and circumstances in these cases, the negatives are the property of the customer.

The taxpayer-printers physically deliver all spider prints to customers upon completion of the job. Undoubtedly, title or ownership of the spider prints transfers to customers. See *Kurtz,* 560 S.W.2d at 861–62.

■ On the other hand, match prints and proof corrections are transferred to the customers only for brief periods—for mark-up or approval—with the understanding that they will be returned to the taxpayer-printers. The taxpayers and their customers have no agreement about ownership of the match prints and correction papers, nor is there evidence of custom or usage of trade (beyond the facts listed in this opinion).

In addition to the other statutory requirements, a "sale at retail" occurs at the time of transfer for "use or consumption" by the ultimate user or consumer. *Section 144.010.1(8); Berry–Kofron,* 137 S.W.2d at 454–55. The taxpayer-printers are the ultimate users and consumers of the match prints and proof corrections. In exemption cases, taxpayers have the burden to identify the ultimate user and consumer of a sale at retail. *Sections 621.050.2 and 136.300.2 RSMo 2000.* On the present record, the taxpayer-printers have not demonstrated a sale of the match prints and proof corrections.

The Director argues at length that the customer's true object is to acquire the publications—not the negatives and spider prints. The cases the Director cites are inapposite, as they apply the "true object" test, which determines whether the true object of a transaction is a service, or a transfer of personal property. *James v. TRES Computer Systems,* 642 S.W.2d 347, 349 (Mo. banc 1982); *K & A Litho Process, Inc. v. Director of Revenue,* 653 S.W.2d 195, 197 (Mo. banc 1983); *International Business Machines Corp. v. Director of Revenue,* 765 S.W.2d 611, 613 (Mo. banc 1989); *Sneary v. Director of Revenue,* 865 S.W.2d 342, 345 (Mo. banc 1993); *International Business Machines Corp. v. Director of Revenue,* 958 S.W.2d 554, 558 (Mo. banc 1997).

The Director seeks to extend the true object test so that the publication is the primary object, while the negatives and spider prints are secondary objects of the transfer. The sales/use tax law makes no such distinction. The sales/use tax law

focuses on the sales/use of tangible personal property, and the rendering of taxable services. *Sections 144.010.1(7), 144.605(13)*. Transfers may include more than one item of tangible personal property or more than one taxable service.

## IV.

As for plate developer and plate finisher, neither Walsworth nor the Director makes any argument to this Court, apparently assuming that the principles for negatives govern the chemicals applied to printing plates. These issues are left for remand.

■ The cardboard folders and filament tape surround the negatives while stored or shipped to customers. This Court has held that "packaging material is purchased for resale when it is purchased for the purpose of transferring the right to use it in return for consideration." *Brambles Industries v. Director of Revenue*, 981 S.W.2d 568, 570 (Mo. banc 1998). Because the negatives are sold to customers, the packaging material accompanying them is also sold. Walsworth's purchases of cardboard folders and filament tape are not subject to sales/use tax.

By the same token, because the proof corrections are not sold to customers, the proof folders accompanying them are not sold. Walsworth's purchases of proof folders are subject to sales/use tax.

## V.

The decisions of the AHC are reversed, and the cases remanded for further proceeding consistent with this opinion.

PRICE, C.J., LIMBAUGH, WHITE, HOLSTEIN and WOLFF, JJ., and EDWARDS, Sp.J., concur.

LAURA DENVIR STITH, J. not participating.

## Appendix

| New Personal Property | Materials | Purchases | Sales/Use Tax |
|---|---|---|---|
| Film negatives: | Film | $2,959,350.78 | $169,184.12 |
| | Acetate plastic and Orange vinyl | 243,021.95 | 10,294.92 |
| | Red litho tape | 57,232.95 | 3,697.64 |
| | Film hardener | 5,249.45 | 304.82 |
| | Cardboard folders (packaging) | 1,969.12 | 127.50 |
| | Filament tape (packaging) | 2,303.68 | 150.26 |
| Spider prints: | Color copy paper | 35,671.59 | 1,544.21 |
| **Materials to be decided on remand:** | Plate developer | 9,002.44 | 380.35 |
| | Plate finisher | 6,745.96 | 445.09 |
| **Items not sold** | | | |
| Match prints: | Match print base/ colored emulsions sheets | 234,552.11 | 9,909.83 |

| Proof corrections: | Proof correction paper | 87,027.25 | 3,681.57 |
|---|---|---|---|
|  | Proof folders (packaging) | 57,609.44 | 3,782.30 |
| **Materials not components or ingredients:** | Opaquing pens | 2,190.85 | 119.22 |
|  | Photograph labels | 8,686.51 | 367.01 |
| **Materials Walsworth concedes taxable:** | Film developer, fixer rejuvenator, activator, and subtractive plate developer | 131,144.66 | 6,136.81 |
|  | Miscellaneous taxable items | 3,213.00 | 152.76 |
| **TOTAL** |  | $3,844,971.74 | $210,278.41 |